UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

DANIEL LUFKIN,                )
                                  )
          Plaintiff,       )
                                  )
     v.                    )       Civil No. 05-106-B-H
                                  )
EASTERN MAINE MEDICAL     )
CENTER,                   )
          Defendant.     )

## RECOMMENDED DECISION

Daniel Lufkin, a nurse previously employed by Eastern Maine Medical Center ("EMMC"), has brought a six-count[1] amended complaint against his former employer. Counts I and II allege gender discrimination under applicable federal and state laws. Counts III and IV allege sexual harassment under federal and state laws. Count V alleges violations of the federal Family and Medical Leave Act. Count VI alleges retaliatory discrimination under 5 M.R.S.A. § 4633. Lufkin claims that discriminatory and retaliatory practices of EMMC led to his constructive discharge and he is claiming damages in the form of front pay, back pay, attorney's fees, punitive damages, pre- and post-judgment interest, and other compensatory damages allowed by law. EMMC has moved for summary judgment on all counts. (Docket No. 29.) I recommend that the Court grant the motion.

---

[1] The amended complaint actually contains seven counts, the seventh count being a demand for jury trial on all counts, but that Count VII was already dismissed without objection from the first complaint. (See Docket No. 15.)

## Statement of Material Facts

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining the "the spirit and purpose" of Local Rule 56). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes appropriately generated by the parties' statements have been resolved, for purposes of summary judgment only, in favor of the non-movant. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

Daniel Lufkin began working at EMMC in 1988 in an undisclosed capacity. (Def.'s Statement of Material Facts (DSMF) ¶ 1, Docket No. 30.) He graduated from nursing school in 1992 and thereafter accepted a position as a staff nurse. (Id. ¶ 2.) Mr. Lufkin's initial work as a nurse was in the Grant 4 Cardiac unit. (Id. ¶ 3.) In March 1993, he received a generally positive performance review from his supervisor with a notation that his verbalization might sometimes be interpreted as argumentative. (Id. ¶ 4.) While employed in Grant 4, some 12 years ago, a female nurse co-worker (i.e., not a supervisor), Sherry Delcourt, was "negative" toward him and she was the one who reported that he was argumentative. (Id. ¶ 5.) Lufkin "qualifies" this statement by noting that Delcourt also made "comments" and "mimicked" him when his speech was not what she thought it should be. According to Lufkin this behavior would never be tolerated against a female nurse, because there is professionalism and attitude amongst the nurses. Lufkin states that this behavior is just not seen female-to-female, but that it is only seen

female-to-male.  (Pl.'s Responsive Statement of Material Facts (PSMF) ¶ 5, Docket No.

44.)  Lufkin relates that Delcourt expressed hostility towards him concerning what she

presumed to be his views on politics and social issues regarding women.  (PSMF ¶ 6.)  In

any event, the relief charge nurse (someone with some supervisory status), Sandy Benton,

defended Lufkin about being argumentative.  (DSMF ¶ 7.)  Lufkin reported to his

Department Head, Cathy Mingo, that Delcourt was biased against him but did not say it

was because of sex.  (Id. ¶ 9.)  Ms. Mingo investigated and got back to him with the

results of her inquiry, which  was that another nurse said he was fine and that she would

keep an eye on the situation.  (Id. ¶ 10.)

     At some later point in 1993 or in early 1994, a male patient accused Lufkin of

trying to force him to take medication.  This was in retaliation for Lufkin's not wanting to

listen to an anti-Semitic joke by that patient.  (Id. ¶ 11.)  The department head took the

complaint seriously and Lufkin made up his mind that he had had enough and would not

work under a department head who believed that sort of thing.  (Id. ¶ 12.)  Lufkin

believed that the department head would not have taken such a complaint seriously if he

had been female.  (Id. ¶ 13.)  Lufkin felt he was attacked on every front in Grant 4

Cardiac so he filed for a transfer.  (Id. ¶ 14.)  Lufkin agrees, however, that he was not

treated adversely in terms of his pay, compensation, benefits, demotion or work schedule

but feels that his "reputation and professional esteem" were adversely affected.  (Id. ¶ 15;

PSMF ¶ 15.)

     Sometime between February 1993 and June 1994, Lufkin transferred to Merit 3

West.  (DSMF ¶ 16.)  Laura Fortin was Lufkin's charge nurse for a time on Merit 3 West.

(Id. ¶ 17.)  Fortin gave Lufkin a positive performance review on June 2, 1994.  (Id. ¶ 18).

For approximately two years time Lufkin was not subjected to any harassment, negative job action or anything else that he contends was motivated by animus toward him on account of his sex or gender.  (Id. ¶¶ 19-20.)  However, starting sometime in 1995, Ms. Fortin made statements in his presence such as "men are jerks," though she never directed such statements at him.  (Id. ¶ 21.)  On one occasion, Fortin is reported to have given Lufkin an unfair (and undisclosed) evaluation which the department head replaced.  (Id. ¶ 22.)  Lufkin and the majority of nurses on the shift, all of whom were females but he, made a complaint to the department head, Penny Dolley, about Fortin.  As a group, the nurses mentioned that Ms. Fortin was making comments about men being jerks in Lufkin's presence, that she was slamming charts, dragging them into the office, and giving Lufkin unsafe assignments that are not described in any detail.  (Id. ¶ 23.)  Lufkin and the female nurses on the shift were acting in concert together to oppose what they thought was a dictatorial supervisor.  (Id. ¶ 24.)  Lufkin qualifies this statement by noting that he believed Fortin's abusive behaviors were focused primarily on him.  (PSMF ¶ 24.) Lufkin reported to Ms. Dolley that he felt he was being mistreated by Fortin due to his gender.  Dolley held a meeting with Lufkin and Ms. Fortin to try to resolve the problem. The problem did not get resolved and they continued to meet with the administrator.  (Id. ¶ 25.)  The meetings with the patient care administrator included female nurses and the primary thrust of the complaints made about Fortin were related to her management or mismanagement style.  (Id. ¶ 26.)  Ms. Dolley suggested that Lufkin transfer to another department.  (Id. ¶ 27.)

Mr. Lufkin transferred to the Intensive Care Unit (ICU) in early 1996.  (Id. ¶ 28.)

Since 1993 the ICU Department Head has been Mary Ellen McKenney, a registered nurse.  (Id. ¶ 29.)  In the ICU there is a formal position known as the "Charge Nurse" for which individuals must apply separately.  (Id. ¶ 30.)  The duties of a charge nurse (sometimes referred to as the "regular charge nurse") include preparing annual evaluations of staff nurses who work the same shift and setting nursing assignments.  (Id. ¶¶ 31-32; PSMF ¶ 32.)  A charge nurse does not administer discipline and has no authority over the hiring or firing of nurses.  (DSMF ¶ 33.)  If a problem arises with a staff nurse the charge nurse is expected to document it and report it to either the Clinical Coordinator of ICU or to Ms. McKenney, the Department Head.  (Id. ¶ 34.)  At times ICU staff nurses serve as relief charge nurse for particular shifts.  (Id. ¶ 35.)  In addition to charge nurses, ICU uses "preceptors" to train new staff nurses.  A preceptor is merely an experienced ICU staff nurse.  (Id. ¶ 42.)  The preceptor's role is to orient the new nurse to the ICU, make sure the new nurse knows where things are kept and what the standard operating procedures are, and to make sure they have a good understanding of the necessary nursing skills.  A preceptor is generally assigned to a new staff nurse in ICU for a period of about eight weeks.  (Id. ¶ 41.)  If a problem arises in the course of precepting a new nurse, the preceptor is expected to consult with the charge nurse, the clinical supervisor, or with the head of the department.  (Id. ¶ 43.)  When Mr. Lufkin joined ICU he was initially assigned to a female preceptor named Donna Bulger.  (Id. ¶ 40.)

Very early in his ICU orientation, Lufkin made a serious medication error that could have seriously harmed a patient after he told Ms. Bulger he was familiar with administering Dilantin.  Because he told her he was familiar with the medication, rather

than supervising Lufkin's administration of the medication in question, Bulger left the room to get something.  When she came back, he was in the process of pushing Dilantin "into the central line" through a solution with which it is incompatible.  (Id. ¶ 44.)  The medication precipitated and crystallized.  When Bulger returned she heard that all of the pumps were alerting to an occlusion and the reason for that was because the precipitate was forming in the line.  (Id. ¶ 45.)  Bulger stopped Mr. Lufkin from continuing with the medication, and was able to aspirate the crystals out of the line so no harm came to the patient.  (Id. ¶ 46.)  Bulger spoke to the charge nurse, Nancy Chase, about this incident as well as to Ms. Benton, the clinical nurse specialist.  (Id. ¶ 47.)  Bulger was quite upset.  (Id. ¶ 48.)[2]  Ms. Schwarze, Mr. Lufkin's sister, was also an ICU nurse.  (Id. ¶ 49.)  On one occasion, Ms. Schwarze saw Bulger come "flying out of" a patient room saying that Lufkin was an idiot and did not belong in ICU.  (Id. ¶ 50.)  There is no indication whether it was on the same occasion as the Dilantin episode.  Bulger also commented to Schwarze on a later occasion that she did not like Lufkin and believed he was not a very good nurse.  (Id. ¶ 51.)  Schwarze informed Lufkin that Bulger referred to him as an idiot, said he would never make it in the ICU and "mimicked" and "mocked" him.  (Id. ¶ 52.)  Ms. Bulger did not say anything specific about Mr. Lufkin's gender in his presence, but Lufkin states that it was reported back to him that he was "a stupid male nurse" and would never make it in ICU.  (Id. ¶ 53; PSMF ¶ 53.)  Lufkin believes that Bulger's mimicry of him would not have been tolerated against a female employee.  (PSMF ¶ 53.)  Bulger testified at her deposition that she did not like Mr. Lufkin and did not think he was

---

[2]       Lufkin denies paragraphs forty-four through forty-eight, but provides no record citations disputing the factual statements.  The basis of the "denial" is an assertion that the factual statement is "immaterial, irrelevant and its prejudicial impact outweighs its probative value" and it should be stricken.  I overrule the objection and have considered these undisputed factual assertions.

a particularly good nurse.  (DSMF ¶ 54.)  Lufkin eventually met with his clinical

supervisor and requested a new preceptor, which he received and with whom he had no

problems.  (Id. ¶ 56).  Thereafter, Bulger treated him with condescending sarcasm when

he crossed paths with her.  (Id. ¶ 57.)  Bulger was never in any supervisory role over Mr.

Lufkin after her preceptorship of him ended.  (Id. ¶ 58.)  Ms. Bulger stated in a 1996

meeting with Mr. Lufkin and the clinical coordinator, Sandy Benton, that Lufkin needed

to "get a set of balls."  (Id. ¶ 59.)  The record does not disclose the substance of what

gave rise to this comment or when it was made, other than in the year 1996.

Moving forward two more years, Lufkin received disciplinary action in August

1998 after he erroneously put Tylenol down a nasogastric tube that had been misplaced

by another in a patient's lung, without first checking the placement of the tube.  Mr.

Lufkin admits that he committed the error that led to this discipline.  However, Mr.

Lufkin alleges the incident report about his error was written in the worst possible light.

(Id. ¶ 60.)[3]  Mr. Lufkin's December 1998 performance review was completed by Nancy

Chase as acting charge nurse.  Lufkin believes this review was influenced by an unfair

bias against him on account of gender because he heard a comment from someone else

that Ms. Chase does not like male nurses.  (Id. ¶ 61.)  Lufkin's December 1998

performance review notes that communication issues were discussed with him several

times and that there was a concern among the charge nurses and fellow staff members.

The issue of communication was that he was "jumping the chain of command" by going

above the charge nurse to the resource nurses.  (Id. ¶ 62.)  Lufkin does not explain why

he considers the review to have been unfair.

---

[3]       Lufkin denies this paragraph, but provides no record citation controverting it.  He asks that the
paragraph be stricken as prejudicial.  I overrule his objection.

Mr. Lufkin's next performance review, in July 1999, was also completed by Ms. Chase.  This review speaks positively about aspects of his performance.  (Id. ¶ 63.) Communication skills apparently remained an issue although he was improving on them. Lufkin does not deny that he continued to have problems with his communication skills in that he skirted notifying the charge nurse, specifically, Ms. Chase, by calling physicians and requesting help.  Nor does he deny that he continued to request help from the resource nurse instead of calling for help from Ms. Chase.  (Id. ¶ 64.)  Lufkin merely qualifies this statement by noting that Ms. McKenney agreed that Chase had no means of objectively quantifying communication skills, even though she believed them to be an issue.  (PSMF ¶ 64.)  According to Ms. Schwarze, Chase had a reputation of not liking male nurses and did not think males ought to be nurses.  (PSMF ¶ 65.)  Lufkin perceived that in the time he worked in the ICU, Chase, who worked as acting charge nurse between February 1998 and December 2000, gave him sour looks and acted in a condescending manner, made fun of the way he walked by mimicking an ape on at least one occasion in approximately December 2003, excluded him from code situations by telling him she had enough help and to go look after other patients, displayed a general hostile demeanor toward him, and looked at male nurses with disdain.  (Id. ¶ 66.)  Lufkin never made a report or complaint about Nancy Chase being biased against him or sexually discriminating against him to anyone other than his sister, Ms. Schwarze, prior to February 2004.  (Id. ¶¶ 67-68; PSMF ¶¶ 67-68.)

EMMC asserts and Lufkin admits that part of the teamwork involved in responding to a code situation in ICU involves not just tending to the coding patient but also to the patients whose regular nurses are responding to a code.  (DSMF ¶ 69.)  Lufkin

also admits that he was not excluded from every code with Ms. Chase.[4]  (Id. ¶ 70.)

Lufkin makes no contention that any other charge nurse between 2001 and 2004 ever

excluded him from a code.  (Id. ¶ 71.)

In addition to the foregoing treatment by Ms. Chase, another female nurse, Tracy

Arno, who sometimes served as a relief charge nurse, told Lufkin to shut up "many many

dozens" of times and on one occasion she told him to "shut up or she would pull his hair."

(Id. ¶ 73; PSMF ¶ 73.)  However, Ms. Arno never said anything to Mr. Lufkin that

objectively showed that she was biased against him on the basis of sex.  (DSMF ¶ 74.)

Nevertheless, Lufkin believes that Arno would "not have gotten away with it" had she

directed such behavior toward female nurses.  (PSMF ¶ 74.)  There is no indication as to

the time period in which Ms. Arno made such comments.

Moving forward three years from the time in which Ms. Chase served as Mr.

Lufkin's charge nurse, to December 2003 or January 2004, another female nurse,

Michelle Lizotte, slapped Lufkin on the back of the head, telling him to wake up while he

---

[4]       According to EMMC, in the period from January 1996 through March 2004 in ICU during shifts
when Mr. Lufkin was working, there were a total of 16 codes: four in 1996, four in 1997, two in 1998,
three in 1999, none in 2000, two in 2001, one in 2002, none in 2003 and none in 2004 through the end of
March.  EMMC asserts that on only one occasion in 1999 was there a code when Lufkin was working and
Chase was serving in an acting charge nurse or relief charge nurse capacity.  (Id. ¶ 72.)  EMMC supports
this statement with a declaration by Ms. McKenney (ICU Department Head).  Ms. McKenney asserts in her
declaration that she researched EMMC's code record for ICU, which she attests are kept in the usual course
of EMMC's business.  She has access to these records as a member of management.  Lufkin denies this
statement and asks that it be stricken on the ground that he "has not seen it before and has not had an
opportunity to cross-examine any witnesses on the subject."  (PSMF ¶ 72.)  In reply to the objection,
defense counsel asserts that the "referenced materials" were provided in discovery prior to McKenney's
deposition.  (Reply SMF ¶ 72, Docket No. 48.)  I overrule the objection because the mere fact that Lufkin
was not previously made aware of these facts and has not cross-examined anyone concerning them is not in
itself a valid basis for striking the facts from the record or calling their validity into question.  Lufkin has
not pointed to any interrogatory that would have called for the disclosure of these specific facts and he has
not suggested that he did not, in fact, receive the relevant records in the course of discovery.  I include this
factual controversy in a footnote because Lufkin has admitted that Chase did not exclude him from every
code and offers only the most generalized assertion that he "perceived" Chase had excluded him.  There is
also no indication that being excluded from a code is a bad thing or that being included in a code situation
is something Lufkin desired.

was "charting."  (<u>Id.</u> ¶ 75).  Lizotte made no reference to gender in this incident.  (<u>Id.</u> ¶ 76).  Lufkin does not inform us whether he was sleeping or not.  Also in December 2003 or January 2004, a female nurse named Linda Perkins told Mr. Lufkin in a snide way that it was really unusual for him to come help with a patient that was not assigned to him. (<u>Id.</u> ¶ 77.)  Ms. Perkins made no reference to gender in this incident.  (<u>Id.</u> ¶ 78.)  Between July 2003 and February 8, 2004, Lufkin heard that Schwarze had heard Perkins say negative things about Lufkin such as that he was a rotten nurse.  (<u>Id.</u> ¶ 79.)  Between July 2003 and February 8, 2004, another female nurse, Sylvia Berry, walked by Mr. Lufkin, flicked his ear, and laughed.  (<u>Id.</u> ¶ 80.)

On one occasion in December 2003 or January 2004, a female staff nurse, Cameron Dalton, was talking in Mr. Lufkin's presence to another female staff nurse, Elizabeth Smith-Hilton, about a problem she had and Smith-Hilton responded to Dalton that "all men are jerks."  Mr. Lufkin responded, "You can't tell me that all men are jerks." Ms. Smith-Hilton replied, "Oh, yes I can; well, 90% of them."  (<u>Id.</u> ¶ 82.)  It would appear that prior to this exchange, between 2001 and December 2003, there were no gender-related statements made in Lufkin's presence or even reported to him second-hand by others.

Lufkin never filled the position of charge nurse or resource nurse during his tenure at EMMC.  He contends it was due to gender-based discrimination.  Ms. Chase indicated that she did not believe Lufkin was a candidate for a resource nurse position based on his communication skills and because of his ability to handle stress and because she was "not overly impressed with his skills."  Thus, although he met the standards, she would not have recommended that he fill such a position.  (<u>Id.</u> ¶ 88; Chase Dep. at 41-44,

61.)  Ms. McKenney similarly did not consider Lufkin to be a good resource nurse candidate because in her view, although he generally met the nursing standards, he did not distinguish himself in any way such as by excelling in interpersonal skills and being proactive in helping staff when time allowed.  (DSMF ¶ 88; McKenney Dep. at 41-42.) The record also reflects that Lufkin did not pursue any training or certification of any kind after August 2001.  (DSMF ¶ 89.)  EMMC offers a series of statements indicating that other male nurses at EMMC served as resource nurses and charge nurses.[5]  (Id. ¶¶ 84-87.)  Lufkin disputes the relevancy of these statements because the men apparently worked different shifts.  (PSMF ¶¶ 84-87.)  The relevance of the statements is that Lufkin was aware that other male nurses were obtaining these supervisory or quasi-supervisory nursing roles even if he was not.

Lufkin also believes he lost out on overtime opportunities between when he started working in the ICU in 1996 and February 8, 2004.  (Id. ¶ 91.)  However, Lufkin agrees that overtime would have been available to him if he had requested it.  (Id. ¶ 92; PSMF ¶ 92.)  In fact, any time Mr. Lufkin did request overtime it was granted to him. (DSMF ¶ 94.)  Nevertheless, Mr. Lufkin did not request overtime, despite financial need, because of the treatment he received at work.  He states that he could barely tolerate working his ordinary three-day schedule.  (PSMF ¶ 93.)  Apart from this overtime claim, no action was ever taken against Lufkin in the time between when he began working in ICU in 1996 and February 8, 2004, that cost him money.  (DSMF ¶ 95.)

---

[5]        A male, Ray Buyno, is charge nurse on days in the ICU.  He has served in this capacity for 19 years and continues to be charge nurse.  (Id. ¶ 84.)  Another male nurse, Steve Babin, served as a resource nurse.  (Id. ¶ 85.)  Lufkin believes that another male nurse, David Lee, may also have been offered a charge nurse opportunity.  (Id. ¶ 86; PSMF ¶ 86.)  Another male nurse, Leon Binette, was a candidate for resource nurse because he was an outstanding nurse.  (DSMF ¶ 87.)

In addition to the foregoing plaints, a unit secretary named Connie and a respiratory therapist named Robin "expressed hostility" of some undisclosed kind toward Lufkin at various times, although he never complained to anyone about it.  (Id. ¶ 96.) Lufkin maintains that poorer treatment toward males (presumably male nurses and not doctors or patients) was widespread and part of the "culture" in the ICU, but agrees he made no complaint to management because he "was tired of it all" and "couldn't deal with it."  (PSMF ¶ 96.)

### The February 9, 2004, Complaint of Differential Treatment

On Monday, February 9, 2004, Mr. Lufkin was called to a meeting with Mary McCarthy[6] and Michelle Lizotte.  (DSMF ¶ 97.)  They called him in to talk about a specific incident with a patient that occurred on the weekend of February 1, 2004.  (Id. ¶ 98.)  During this meeting, Lufkin related to McCarthy and Lizotte that he felt he was treated differently based on gender.  (Id. ¶ 99.)  In every year Lufkin worked in ICU, the ICU Department Head, Mary Ellen McKenney, reviewed his performance evaluation with Lufkin.  While she reviewed his performance evaluation with him McKenney asked him each year whether there were any issues he wanted to bring to her attention.  Lufkin never raised any issues of discrimination with McKenney before February 9, 2004.  (Id. ¶ 100.)  Lufkin knew he could go to McKenney with a problem and he had no personal experience with her failing to respond to a problem.  (Id. ¶ 101.)  Lufkin qualifies this assertion by noting that other nurses, including his sister, told him McKenney would retaliate against those who complained or grieved.  Lufkin says he did not feel safe reporting problems to McKenney because he might lose his job and be unable to support his children.  (PSMF ¶ 101.)  Once Lufkin's allegation was passed to McKenney, she

---

[6]     The parties' statements do not explain who Ms. McCarthy is.

talked with all male ICU nurses to see if anyone else felt as though they were discriminated against as men or were aware of any gender discrimination.  (DSMF ¶ 102.)  She also spoke with various female nurses about the same issue.  (Id. ¶ 103.)

On February 22, 2004, Tracey Arno, who was then acting as relief charge nurse, spoke to Mr. Lufkin about being more helpful to other ICU nurses, and about his excessive personal use of the computer while he was on duty.  Such comments were made to Lufkin several times in February or early March.  (Id. ¶ 104.)  This was only a counseling, not discipline, but Lufkin notes that discipline at the hospital starts with an oral warning.  (Id. ¶ 105; PSMF ¶ 105.)  There is a formal structure for progressive discipline of nurses at EMMC.  Discipline of nurses consists of oral warnings, written warnings, suspensions and terminations from employment.  (DSMF ¶ 106.)  A nurse can also be counseled on job performance.  Counseling is not discipline.  (Id. ¶ 107.)  Ms. Arno spoke to Ms. McKenney about the complaints and McKenney told her she needed to address it with Lufkin.  (Id. ¶ 108).  McKenney did not discipline Mr. Lufkin for personal use of the computer but told him she would if it continued.  (Id. ¶ 109.)  According to EMMC, McKenney also counseled two female nurses for personal use of the computer in the ICU and, as she did with Lufkin, she warned them that if it happened again they would be disciplined.  (Id. ¶ 110.)  Ms. Chase has told the entire shift of nurses, male and female, that they need to help out even when they have not been asked and she singled out a female nurse and told her she needed to help even when she was not asked.  (Id. ¶ 111.)

*Lufkin's Family Problems and Subsequent FMLA Leave*

On March 5, 2004, Mr. Lufkin was served with legal papers at EMMC on behalf of his ex-wife, putting him on notice that his ex-wife was seeking custody of their two sons.  He was very upset by this.  (Id. ¶ 112.)  On March 6, Lufkin contacted Ms. McKenney.  He told her he was too upset to work because of the custody dispute, and asked for time off from work.  He attributed this request, at least in part, to family problems.  (Id. ¶ 113.)  During the March 6 conversation, Lufkin and McKenney agreed to meet to discuss his allegation of gender discrimination in more detail.  (Id. ¶ 114.) McKenney granted his leave and Lufkin was out of work during the weekend of March 6-8.  (Id. ¶ 115.)  On March 11, McKenney met with Lufkin.  Also attending the meeting were Lynn Hilyard, a union representative, and Ms. McCarthy.  (Id. ¶ 117.)  McKenney did not meet with Lufkin until March 11 because it took time to talk to the other men in ICU and because she only saw Mr. Lufkin on Monday mornings and there was a holiday and other days when he was not there when she came in the morning.  (Id. ¶ 118.)  The purpose of the March 11 meeting was to follow-up with Lufkin on the issues that he identified during the February 9 meeting.  During that meeting, McKenney did follow-up on his issues and Lufkin also raised new issues during that meeting.  (Id. ¶ 119.)  At the time of the meeting, Lufkin was still out of work.  McKenney suggested that he apply for FMLA leave.  (Id. ¶ 120.)  Lufkin alleges there was no discussion during this meeting of an end date for any FMLA time.  (Id. ¶ 121.)  Lufkin continued to be on leave after this meeting and until his resignation.  (Id. ¶ 122.)  When Lufkin met with McKenney and McCarthy they gave him the FMLA application forms.  (Id. ¶ 123.)  Lufkin provided the form to his health care provider, had it filled out, and returned it immediately to EMMC.

14

(Id. ¶ 124.)  He recalls turning the FMLA paperwork in to EMMC human resources prior to the weekend of March 19.  (Id. ¶ 125).

Mr. Lufkin did not bring any of the FMLA forms to the ICU.  (Id. ¶ 126.)  During the weekend of March 19, 20 and 21, he did not go to work.  (Id. ¶ 127.)  The charge nurse called Ms. McKenney and asked why Lufkin did not show up for work when he was scheduled.  (Id. ¶ 128.)  McKenney said that, based on her last conversation with Lufkin, it was her understanding that as of March 5, 2004, Lufkin needed two weeks of leave and was due back at work the weekend of March 19-21.  (Id. ¶ 129.)  McKenney told the nurses on the weekend of March 19-21 to document his absence and to call him and leave a message.  (Id. ¶ 131.)  Lufkin received several calls from ICU nurses at his home that weekend.  (Id. ¶ 132.)  During the first call, which he received as a voice mail, he was asked if he was going to come to work.  (Id. ¶ 133.)  He believed the call was an error and did not return it.  (Id. ¶ 134.)  He was then called by Ms. Arno on either March 21 or 22.  (Id. ¶ 135.)  Arno also left a message for him along the lines of asking him whether he was going to show up for work or not.  (Id. ¶ 136.)  He did return this call. He asked Arno to pass it along to have people stop calling him while he is on FLMA leave. (Id. ¶ 137.)  Arno explained to him that it was McKenney's understanding that he had been expected back after having been out for two weeks.  (Id. ¶ 138.)  He disagreed with her statement and informed her that McKenney knew he was on FMLA leave.  (Id. ¶ 139.)  Arno said that was not her understanding and he replied that "that's the way it was."  (Id. ¶ 140.)  He did not receive any further calls during that weekend from anyone in ICU except from his sister, Ms. Schwarze.  (Id. ¶ 141.)  Schwarze told him that McKenney was having the nurses write him up as being "AWOL" for every shift he did

not show up for and that he should do something about it.  (Id. ¶ 142.)  In response, either

he or his union representative got in touch with human resources to straighten things out.

(Id. ¶ 143.)  Human resources told him that he cannot be written up and that they would

take care of it.  (Id. ¶ 144.)  He was told that all of the write-ups had been removed from

his file.  (Id. ¶ 145.)   The cancellation of any discipline for not being at work during this

time period happened by Monday, March 22, 2004.  (Id. ¶ 146.)  On Monday, March 22,

2004, McKenney learned that Mr. Lufkin had been approved for an extension of FMLA

leave during the previous week.  (Id. ¶ 130.)  Lufkin received no other discipline for

being on leave between that point and the date of his resignation.  (Id. ¶ 147.)  Ms. Arno

had simply documented that he called and said that he had been approved for six weeks

of leave.  (Id. ¶ 148.)  Ms. McKenney is not aware of any other nurses who documented

Lufkin as a no-show or documented anything concerning his appearance or

nonappearance on March 19.  (Id.)

A meeting was held on April 8, 2004, with Lufkin and G. Gregory Howat,

EMMC's Vice President of Human Resources.  Mr. Howat has been Vice President of

Human Resources at EMMC since 2001. (Id. ¶ 149.)  Also present in this meeting were

several other individuals, including union representatives, Steve Leavitt, Judy Brown and

Lynn Hilyard as well as Lorraine Rodgerson.  (Id. ¶ 150.)  The purpose of the meeting

was to discuss complaints that had been raised by Lufkin of alleged gender

discrimination.  (Id. ¶ 151.)  At the outset of the meeting, Lufkin presented to Howat a

five-page handwritten single-spaced document which set forth further complaints.  (Id. ¶

152.)  Ms. Rodgerson, Ms. McKenney, Ms. McCarthy and Mr. Howat took some time

separately to go over the document and Howat informed Lufkin and the union

representatives that an investigation would be conducted into Lufkin's complaints and that a written response would be provided.[7]  (Id. ¶ 153.)  Howat asked Lufkin's union representative, Ms. Hilyard, to verify or give a written statement about the matters that had been raised at the March 11 meeting that she, Lufkin, McKenney and McCarthy had attended.  (Id. ¶ 154.)  Howat also asked that Lufkin provide information regarding the time frame for each of the complaints.  (Id. ¶ 155.)  According to Howat, he asked whether Lufkin's union, the Maine State Nurses Association, would be providing statements from other male nurses and was told it would not.  (Id. ¶ 156.)  Howat said he would need to investigate and that a written response would be provided.  (Id. ¶ 157.)

In early May Mr. Lufkin filed his complaint with the Maine Human Rights Commission and the EEOC.  (Id. ¶ 159.)  On or about May 17, Mr. Howat received a copy of the complaint.  (Id. ¶ 160.)  On May 20, Howat informed the union that since essentially the same matter was now pending with an outside agency, and could not be resolved directly between the Union, the Hospital and Lufkin, it did not seem appropriate for him to proceed with an internal response to the complaints.  (Id. ¶ 161.)  On June 11, the union presented a grievance to Howat on Lufkin's behalf and requested that he proceed with the investigation despite the outside pending complaint.  (Id. ¶ 162.)  Howat

---

[7]  Prior to the April 2004 human resources meeting, on February 29, 2004, Mr. Lufkin wrote a letter to his ex-wife stating that it was becoming very difficult, if not impossible, for him to continue in his profession and that he did not think he could do his job safely much longer and that he was going to have to leave.  (Id. ¶ 172.)  On March 30, 2004, Lufkin's attorney, Richard Hall, wrote a letter to the attorney of Lufkin's ex-wife stating as of that date that Mr. Lufkin "does not intend to return to EMMC to work, in spite of whatever may come of the investigation presently underway into his allegations, nor does he intend to return to the nursing profession at all."  (Id. ¶ 174.)  Mr. Hall was authorized to speak on behalf of Mr. Lufkin at the time he wrote that letter. (Id., ¶ 174).  Lufkin "denies" this statement, saying it is "hearsay," but he provides no record citation to controvert that his attorney was authorized to speak on his behalf or that the letter stated something other than as represented.  It is not hearsay if offered to show Lufkin's state of mind as of March 30, 2004.  Lufkin maintains he has been completely unable to engage in any substantial gainful employment from March 17, 2004, to the present.  (Id. ¶ 175.)  Lufkin applied for one nursing job in the Spring of 2004, and was offered an interview but did not follow up because he felt he could not work.  Otherwise he has done nothing to look for a job.  (Id. ¶ 176.)

did so and on June 30, 2004, provided a written report of his investigation to Lufkin.  (Id. ¶ 163.)  This report concluded that Lufkin had not been a victim of gender discrimination. (Id. ¶ 164.)  On July 9, 2004, Lufkin and his union representatives met with Howat and other EMMC representatives.  At no time during this meeting did Lufkin say he was dissatisfied with the June 30 investigation report.  (Id. ¶ 165.)  During this meeting, Lufkin raised two additional issues that he asked to have investigated, pertaining to past lack of advancement opportunities and to a newly described incident involving a female nurse touching him and telling him to "wake up."  Howat agreed to investigate these new reports and to respond to Lufkin separately concerning them.  (Id. ¶ 166.)  Lufkin indicated that he would consider whether he wished to continue his employment at EMMC or not and inform the medical center accordingly.  (Id. ¶ 167.)  On July 15, 2004, EMMC received a letter from Lufkin resigning from his employment dated July 12, 2004. (Id. ¶ 168.)

### EMMC's Sexual Harassment Policy

In each year from 2001 through 2005 Mr. Howat has distributed a notice to EMMC employees concerning EMMC's policy on sexual harassment and its reporting procedure by having his staff print and place an individual label with the name and department of each employee on the employee's copy.  (Id. ¶ 177.)  The letters are distributed to each department head, with instructions to see that employees receive them. (Id. ¶ 178.)  Such letters have been delivered to Ms. McKenney for distribution to all ICU employees in each year from 2001 to the present.  (Id. ¶ 179.)  Howat has been listed as the contact person for sexual harassment complaints in these notices from 2001 to the present.  (Id. ¶ 180.)  There is a poster on the bulletin board for employee notices in the

Kelley 2 part of EMMC regarding the prohibition on sexual harassment.  This poster was posted before Howat came to EMMC in 2001 and remained posted from 2001 through 2005.  (Id. ¶ 181.)  Several EMMC employees have used the complaint procedure described in the annual notices and the poster to complain to Howat or members of his staff in the Human Resources Department at EMMC about instances of sexual harassment.  (Id. ¶ 183.)[8]  At no time between when Howat began work at EMMC in 2001 and his conversation with Daniel Lufkin on April 8, 2004, did Lufkin bring a complaint of sexual harassment or sex discrimination to Howat's attention.  (Id. ¶ 188.) So far as Howat knows or is informed, Lufkin did not bring such a complaint to the attention of any member of the staff of the Human Resources Department at EMMC.  (Id. ¶ 189.)  It is the regular practice of the staff of the Human Resources Department to bring such matters promptly to Howat's attention, and no complaint by Lufkin was brought to his attention.  (Id., ¶ 190).  For many years at EMMC, including the entire period that Howat has been director of human resources, the director of human resources has each year distributed a letter concerning EMMC's policy on sexual harassment and its reporting procedure.  (Id. ¶ 191.)  These letters were distributed to Ms. McKenney as Department Head, with instructions to see that employees in her department received them.  (Id. ¶ 192.)  McKenney's regular practice each year when she received such a letter has been to have it duplicated and a copy placed in the mailbox of each nurse in the ICU.  (Id. ¶ 193.)  Each nurse in the ICU has an individual mailbox in the locker room

---

[8]       Lufkin objects to this statement as hearsay and says that it lacks foundation.  I overrule those objections.  Howat would know from his own personal knowledge whether complaints had been made to Human Resources and Lufkin has no evidence controverting that basic fact.  Furthermore, the statement goes to the issue of whether the policy was distributed, not simply to whether or not Howat received complaints.  Lufkin makes continuing hearsay objections to many of the following facts, but he does not offer any evidence controverting the facts within Howat and McKenney's personal knowledge and I have incorporated those facts into this statement of fact.  The same logic applies to paragraph 184.  I have eliminated some of Howat's self-serving  and immaterial declarations from this statement of fact.

area, where official notices and communications are placed.  Each nurse who comes to

work in the ICU is told to look in their box regularly to receive inter-hospital mail and

notices and similar communications.  (Id. ¶ 194.)  A copy of the letter concerning

EMMC's policy on sexual harassment is also placed on the bulletin board in the ICU.

This annual notice has been posted for about a month in each year for at least the past ten

years.  (Id. ¶ 195.)

*Plaintiff's Statement of Additional Facts*

In November or December of 2003 Michelle Lizotte was appointed as Mr.

Lufkin's direct supervisor.  She admits that, following an incident with a patient in

February 2004, Ms. McKenney told her to document all of Lufkin's wrongdoing, which

she proceeded to do.  (Pl.'s Statement of Additional Facts ¶ 1 (PSAMF).)  McKenney

admits that Lufkin met the standards to be a "Resource Nurse," but states that he was

never considered for the position because she relied on subjective statements made in

unidentified evaluations as to Lufkin's interpersonal skills.  At the same time that

McKenney failed to consider Lufkin for the Resource Nurse position, she authorized Ms.

Lizotte, a female nurse with less experience in the ICU than Mr. Lufkin, to be trained as a

Resource Nurse.  (Id. ¶ 2.)  Lufkin sarcastically observes that Ms. Lizotte "is the same

nurse whose repertoire of 'interpersonal skill' included slapping [Lufkin] up the backside

of the head."  (Id.)

## Discussion

"The role of summary judgment is to look behind the facade of the pleadings and

assay the parties' proof in order to determine whether a trial is required."  Plumley v. S.

Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary

judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

In opposition to EMMC's summary judgment motion Mr. Lufkin asserts that it would violate his Seventh Amendment right to a trial by jury to dispose of his case pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Pl.'s Opp'n Mem. at 11-14.) I pause to put that contention to rest before addressing the motion. Were it true that modern summary judgment practice violates the Seventh Amendment, such seminal Supreme Court cases as McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which defines the burdens that defendants and plaintiffs must each bear in a summary judgment contest over the existence of discriminatory animus, would need to be rejected as unconstitutional, as would Rule 56. Furthermore, to the extent Rule 56 has been

21

discussed by federal circuit courts in terms of its relation to the Seventh Amendment, it has been resoundingly approved.  Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1568 (1st Cir. 1994); Barber v. Kimbrell's, 577 F.2d 216, 221 n.12 (4th Cir. 1978) (citing Fidelity & Deposit Co. v. United States, 187 U.S. 315, 320 (1902) (approving the use of the progenitor of Rule 56 in contract collection matters)); Oglesby v. Terminal Transport Co., 543 F.2d 1111, 1113 (5th Cir. 1976) ("No constitutional right to a trial exists when after notice and a reasonable opportunity a party fails to make the rule-required demonstration that some dispute of material fact exists which a trial could resolve."); King v. United Benefit Fire. Ins. Co., 377 F.2d 728, 731 (10th Cir. 1967) ("It is firmly established that the granting of a motion for summary judgment or directed verdict in an appropriate case does not infringe upon the right to trial by jury.").

Daniel Lufkin asserts the following claims, by count:

I.  Gender discrimination under Title VII consisting of adverse employment measures and constructive discharge;

II.  Gender discrimination under the Maine Human Rights Act (MHRA) redundant of count I;

III.  Sexual harassment (Title VII)

IV.  Sexual harassment (MHRA)

V.  Violation of the federal Family Medical Leave Act; and

VI.  Retaliatory discrimination under the MHRA.

EMMC's motion for summary judgment does not track the counts and addresses a hostile work environment claim that is not expressly stated in the complaint.  My discussion addresses the issues in the order raised in EMMC's summary judgment motion, which

treats with the FMLA claim first and then considers the sex/gender claims generally in the order set forth in the complaint.

**A.      The FMLA Claim**

EMMC argues that Lufkin's FMLA claim has no support in the record because the record reflects that EMMC afforded Lufkin with all of the FMLA leave he requested and that it was Lufkin's voluntary choice not to return to work from leave.  (Def.'s Mot. Summ. J. at 5-8, Docket No. 29.)  Lufkin's description of his FMLA claim is not easy to paraphrase, so I quote:

> First, . . . . Mr. Lufkin attempted to exercise his rights and was told that he would be subject to disciplinary action for being away without leave.
> Second, . . . the psychological trauma Mr. Lufkin faced by being told that he was again under attack, for something that he knew he was rightfully entitled to was significant and further disabling.

(Pl.'s Mem. in Opp'n at 20-21, Docket No. 43.)  Presumably, Lufkin refers here to the fact that he received calls at home while he was on FMLA leave asking why he was not at work.  The record demonstrates that Lufkin informed Ms. Arno that he was still on FMLA leave and that the matter was straightened out within two or three days once Lufkin contacted human resources and human resources relayed to the ICU Department that Lufkin's family medical leave was still in place.  According to Lufkin, these circumstances demonstrate "interference" with his "attempt to exercise" his FMLA rights. (Id. at 20, quoting 29 U.S.C. § 2615(a)(1).  Lufkin does not cite any precedent for his theory of the case.

The FMLA prohibits actions by "any employer to interfere with, restrain, or deny the exercise of "FMLA rights." 29 U.S.C. § 2615(a)(1).  An FMLA interference claim is distinct from an FMLA discrimination or retaliation claim.  Interference involves the

denial of substantive rights that the FMLA prescribes for employees; discrimination and retaliation involve violations of FMLA provisions that proscribe certain conduct by employers.  See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159-60 (1st Cir. 1998). The Court of Appeals for the First Circuit has recently held that the distinction between an interference claim and a retaliation claim turns on "whether the plaintiff is, at bottom, claiming that the employer denied his or her substantive rights under the FMLA or that the employer retaliated against him or her for having exercised or attempted to exercise those rights." Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 332 (1st Cir. 2005).  With interference claims, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA." Hodgens, 144 F.3d at 159.  Such claims include not only outright denials of substantive rights, but also other actions by an employer that prevent or even "deter" employees from exercising their rights. Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 C.F.R. § 825.220(b) and Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001)).

I conclude that the weekend episode involving a few calls from the ICU Department does not support a claim for FMLA leave interference because Lufkin has not introduced any statement to the effect that he felt even slightly inclined to report to work as a consequence of the calls from the ICU Department (assuming such evidence would even support a claim of interference) and, more importantly, because the defendant, EMMC, acting through its human resources department, clearly afforded Lufkin all of the family medical leave he requested.  In other words, there is absolutely no suggestion in the record that Lufkin was denied or even "deterred" from taking any of

the leave he sought to take.  Lufkin clearly knew that he was authorized by EMMC's Human Resources Department to take the FMLA leave he requested even though there had apparently been a failure of communication among Lufkin, the Human Resources Department and McKenney about the date of Lufkin's anticipated return to work.  Once the problem was identified it was quickly resolved favorably to Lufkin.

**B.      Hostile Work Environment and Constructive Discharge**

Lufkin's first and second claims assert sex discrimination in employment consisting of nonspecific adverse employment measures coupled with alleged constructive discharge.  Lufkin's third and fourth counts assert sexual harassment claims.  Although the constructive discharge claims are asserted in conjunction with the "adverse employment action" claims and the hostile work environment claims are not expressly stated in the amended complaint at all, the hostile work environment and constructive discharge claims are appropriately addressed together because they both depend on the totality of the circumstances experienced by Lufkin in the workplace.  Accordingly, I address these two theories together in this section.

EMMC argues that Lufkin's hostile work environment claim cannot succeed because the treatment he bases the claim on was not severe or pervasive and was not visited upon him because he is male.  (Def.'s Mot. Summ. J. at 8-9.)  In order to prove the existence of a hostile work environment Lufkin must demonstrate that the workplace was "permeated" with discriminatory "intimidation, ridicule, and insult," that was so "severe or pervasive" that it altered the conditions of his employment to create an "abusive working environment" or interfered with his work performance.  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001); Harris v. Forlift Sys., 510 U.S. 17, 21 (1993).

This standard recognizes that "work places are rarely idyllic retreats." Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996), and that "not everything that makes an employee unhappy qualifies as . . . actionable," Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996) (concerning what constitutes an adverse employment action). It also serves to prevent federal anti-discrimination laws from being applied as general workplace civility codes. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 81 (1998).

As always, "[t]he critical issue is whether members of one sex are exposed to disadvantageous terms of employment to which members of the other sex are not exposed." Id. at 80. In addition to alleging sexual harassment, Lufkin contends that the working conditions imposed by EMMC had become so onerous, abusive, or unpleasant that a reasonable person in his position would have felt compelled to resign. Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). In order to succeed with this claim, the evidence must be sufficient to permit a jury to find that the harassment he was subjected to was "so severe and oppressive that staying on the job while seeking redress [would have been] 'intolerable.'" Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 45 (1st Cir. 2003).

In opposition to EMMC's summary judgment motion Lufkin highlights the statements by Ms. Fortin and Ms. Dalton that "men are jerks." He also flags Ms. Bulger's 1996 comment that he needed to "grow a set of balls." (Pl.'s Opp'n Mem. at 15.) In Lufkin's view this evidence alone is enough to attribute an anti-male animus to everything unpleasant that happened to him at EMMC. I disagree. Of all of the various female nurses that either said or did something mildly offensive to Lufkin, only Ms. Chase has some reputation for an anti-male attitude when it comes to men working as

26

nurses.  But even if her acts are assumed to reflect anti-male animus, they fall far short of

what any reasonable person could regard as severe or pervasive acts of intimidation,

ridicule and insult.  On one occasion she mimicked him while walking in an apelike

fashion and otherwise did nothing more than give sour looks and act condescendingly

toward him.  Stacked atop these acts are a variety of minor slights or offhand comments

not directed at Lufkin and two instances of insult from Ms. Bulger, none of which a

reasonable person could fairly characterize as severe acts of intimidation, ridicule and

insult, and which in the aggregate simply do not demonstrate a working environment

pervaded by intimidation, ridicule and insult, particularly in view of the fact that they are

spread out over a ten-year period.  I summarize these experiences here:

### Grant 4

Sometime prior to 1994, a female co-worker made comments and mimicked Lufkin's manner of speaking on occasion and his department head took seriously a patient's accusation that Lufkin tried to force medication.  There is nothing in the record from which a jury might infer that these acts arose from anti-male feelings.  In effect, Lufkin was subjected to occasional teasing by a co-worker.

### Merit 3 West

Lufkin experience a dictatorial charge nurse, Ms. Fortin, who gave him a positive performance evaluation in June 1994, but who in 1995 made a statement to the effect that "men are jerks."  Also in 1995 Ms. Fortin gave him an unfair evaluation that the department head replaced. The majority of the nurses who worked under this charge nurse complained of her behavior.  In other words, Lufkin was treated unfairly on one occasion and had to hear someone express the sentiment that men are jerks.

### ICU

Sometime in 1996 Ms. Bulger called Lufkin an idiot and said he did not belong in ICU.  She is also reported to have mimicked him and acted in a condescending way toward him.  He heard that she once referred to him as a stupid male nurse.  She is also the nurse who once stated that he

needed to "get a set of balls." A reasonable person could fairly characterize Ms. Bulger's conduct toward Lufkin as insulting, although the record also demonstrates that instances of poor performance underlay these critiques. Still, a reasonable juror could conclude that Ms. Bulger treated Lufkin in an insulting manner.

Between 1998 and 2003, Ms. Chase faulted Lufkin for communication issues once, gave him some sour look and exhibited a condescending, hostile affect. On one day in 2002, she mimicked him by walking in an apelike manner. Meanwhile, Ms. Arno told Lufkin to shut up on several occasions that are not detailed. A reasonable juror could draw one act of insult from this roughly six-year period (the ape pantomime).

In December 2003 or January 2004, Ms. Lizotte slapped Lufkin on the back of his head and told him to "wake up." Around the same time another nurse snidely commented that it was unusual for him to volunteer help. He was informed by his sister that this nurse made negative comments about him outside of his presence as well. Yet another female nurse flicked his ear one day and laughed. A fourth female nurse remarked to another female nurse that "all men are jerks" while speaking about a personal problem. At best, being slapped and having his ear flicked amount to two offensive, non-sexual contacts over a ten-year period.

Such is the sum total of Lufkin's personal experience of negativity or unpleasantness in the workplace over a ten-year period. Hardly what a reasonable person could regard as pervasive abuse in the workplace. And with respect to severe acts we have nothing to speak of. The record reflects only two insulting statements by Ms. Bulger in 1996, one act of insult or ridicule by Ms. Chase in 2002 and one instance of being slapped on the back of the head in 2003 or 2004. These acts reflect a certain lack of civility, but they cannot reasonably be regarded as severe acts of intimidation, ridicule or insult.

A hostile work environment generally is not created by a "mere offensive utterance," Harris, 510 U.S. at 23; nor does it arise from "simple teasing, offhand comments, and isolated incidents." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Courts are supposed to use "common sense, and an appropriate sensitivity to social context," to distinguish between such innocuous behavior and severely hostile or abusive conduct. Oncale, 523 U.S. at 82.

28

Ugurhan Akturk Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003).  "The

workplace is not a cocoon, and those who labor in it are expected to have reasonably

thick skins -- thick enough, at least, to survive the ordinary slings and arrows that

workers routinely encounter in a hard, cold world."  Suarez, 229 F.3d at 54.  Although

questions regarding the severity or pervasiveness of harassment are ordinarily reserved

for the factfinder, "summary judgment is an appropriate vehicle for 'policing the baseline

for hostile environment claims.'"  Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83

(1st Cir. 2006) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999)

(en banc)).  In this case common sense calls for some policing at the baseline of the

hostile work environment standard.  If a judgment favorable to Lufkin could be rendered

on the circumstances set forth in the parties' statements of material fact, then the federal

and state anti-discrimination laws would truly have become general civility codes.

Although some of the conduct complained of was objectively insulting, none of it was

"severe" or "extreme" and the vast majority of it consisted of nothing more than "sporadic

use of abusive language, gender-related jokes, and occasional teasing."  Faragher, 524

U.S. at 788 (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law

175 (1992)).  Finally, there is no competent evidence that the acts complained of

interfered with Lufkin's work performance in any way.  Indeed, Lufkin fails to articulate

in even the most cursory manner what the relationship was between the conduct he

complains of and his performance of his duties.  The only evidence offered by Lufkin that

even tangentially touches upon that question is his assertion that he did not want to

request overtime because he did not wish to be at work any more than he had to be.  In

itself, that evidence does not tend to demonstrate interference with his ability to perform

his job when he was required to be at EMMC.  Accordingly, I recommend that the Court grant EMMC's motion for summary judgment with regard to Lufkin's hostile work environment and constructive discharge claims.

**C.    Disparate Treatment**

Lufkin also alleges that he was denied the opportunity to serve as a resource nurse because he was male.  How one comes to be a resource nurse is not well laid out in the parties' statements.  Evidently, the resource nurse position is one to which nurses are appointed.  Because Ms. McKenney and Ms. Chase were questioned about Lufkin's suitability for the resource nurse post, I deduce that the department head and the charge nurse have some role in selecting or appointing resource nurses.  There is no contention that the post is one that every, or even most, nurses can expect to fill at some point during their nursing careers.  Lufkin contends that he was denied the opportunity to be a resource nurse because he was a man.  He argues that gender animus is demonstrated by the fact that Ms. Lizotte obtained the resource nurse post but he did not.  However, he has not developed the kind of record that would permit an objective comparison of his qualifications and Ms. Lizotte's qualifications, other than to observe that she was the one who slapped him "up the backside of the head."  (Pl.'s Opp'n Mem. at 19.)  Of course, there is no indication that Ms. McKenney or any other person with authority to appoint a resource nurse had knowledge of this act.  Thus, the limited evidence in the record does not enable a favorable finding.  See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (stating that a "claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects").  Even if Lufkin had made some effort to mount a serious disparate treatment

claim, his evidence would have to be relatively forceful as to his suitability for the resource nurse post because courts are generally not in a good position to "second-guess the business decisions of an employer, imposing . . . subjective judgments of which person would best fulfill the responsibilities of a certain job." Rossy v. Roche Prods., Inc., 880 F.2d 621, 625 (1st Cir. 1989).  As it stands, EMMC has asserted that Lufkin was not appointed to serve as resource nurse because of his poor communication skills and a perception that he was not proactive in his efforts to help other nurses.  Lufkin has not presented any evidence capable of exposing these legitimate, non-discriminatory explanations as pretext and therefore fails to carry his summary judgment burden. See McDonnell Douglas, 411 U.S. 792; Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999) (outlining the "three-stage burden-shifting framework set forth in McDonnell Douglas" for proving discriminatory animus with circumstantial evidence).[9]

**D.    Retaliation**

Lufkin's final claim is that EMMC retaliated against him for making a complaint about what he perceived was sex discrimination in the workplace.  EMMC argues that summary judgment is called for with regard to this claim because there is no evidence of any adverse employment action befalling Lufkin subsequent to his exercise of rights

---

[9]     In addition to the resource nurse claim that is actually argued by Lufkin as a substantive claim in his memorandum of law, Lufkin's statement of material facts includes assertions to the effect that, had he engaged in the kind of behavior against female nurses that they engaged in toward him, it "would not have been tolerated." (PSMF ¶¶ 5, 53.)  This assertion is supported by nothing other than Lufkin's personal surmise.  He does not point to objective evidence tending to make an objective comparison possible.  As a consequence, there simply is no basis in the record for a jury to find disparate treatment by EMMC based on competent evidence.  Additionally, Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Oncale, 523 U.S. at 81.

protected by Title VII or the MHRA or of any causal connection between any adverse action and his exercise of protected rights.  (Def.'s Mot. Summ. J. at 21-22.)

In order to make out a prima facie case of retaliation Lufkin must demonstrate that he engaged in protected activity and that EMMC retaliated by subjecting him to consequences that were objectively and materially adverse, i.e., the kind of retaliation that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Railway v. White, __ S. Ct. __, No. 05-259, 2006 WL 1698953, at *10, 2006 U.S. LEXIS 4895, *14 (June 22, 2006) (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)); but see Doyle v. Dep't of Human Servs., 2003 ME 61, ¶ 20, 824 A.2d 48, 55-56 (using the "adverse employment action" term of art when describing the plaintiff's prima facie burden).[10]

In support of his retaliation claim, Lufkin relies on the complaint he made on February 9, 2004, to ICU Department Head McKenney, that he felt he was treated differently in the ICU based on his gender.  (Pl.'s Opp'n Mem. at 19.)  There is no question but that this constituted protected activity.  As for retaliatory consequences, Lufkin cites, among other things, the fact that Ms. Lizotte was appointed to serve as charge nurse, and hence as his direct supervisor, "at almost the same time."  (Id.)  This is a curious statement insofar as the summary judgment record reflects that Ms. Lizotte was appointed to serve as resource nurse in November or December of 2003, at least two months prior to his complaint.  If there is some other supervisory post to which she was subsequently appointed, it is not set forth in the parties' statements of material fact.

---

[10]     Lufkin's retaliation claim is pursued exclusively pursuant to 5 M.R.S.A. § 4633.  (Second Am. Compl. Count VI.)  This Court has traditionally construed the federal and state anti-retaliation provisions in a consistent fashion.  For that reason, I have applied the Supreme Court's new prima facie standard for Title VII retaliation claims (which favors Lufkin) even though Lufkin's retaliation claim is advanced exclusively under state law.

Additionally, the record reflects that Lizotte was present with Ms. McKenney at the February 9, 2004, meeting with Lufkin to address a performance issue, suggesting that she was already occupying whatever supervisory role she had at the time.  Even assuming that Lizotte's promotion could reasonably be regarded as an objectively and materially adverse event, there simply are no reasonable bases available in the record to infer that Lizotte was promoted subsequent to, or in retaliation for, Lufkin's exercise of protected rights.

Mr. Lufkin's next assertion of retaliation is that, in his words, Ms. Lizotte "admits that following an incident with a patient in February 2004 the Department head (Ms. McKenney) told her to document all of Mr. Lufkin's wrongdoing, which she proceeded to do."  (PSAMF ¶ 1.)  But when in February 2004 did McKenney give this instruction?  The record reflects that McKenney and Lizotte called Lufkin to the February 9, 2004, meeting for the very purpose of discussing a performance-related matter involving a specific incident with a patient that occurred on the weekend of February 1, 2004.  (DSMF ¶ 98.).  The cited portion of Lizotte's deposition transcript does not illuminate the issue.  As a consequence, there simply is no evidence in the summary judgment record to support a finding that any retaliatory measure was taken subsequent to Lufkin's complaint of what he perceived as disparate treatment.  Without such evidence Lufkin fails to present a prima facie case of retaliation because it is impossible to find that a causal relation existed between his complaint and any allegedly retaliatory measure instituted by McKenney.  In addition to this threshold problem, there would still remain the question of whether an instruction communicated to Lizotte from McKenney to document wrongdoing could possibly rise to the level of something that would dissuade a

33

reasonable person in Lufkin's position from making a complaint.  Even if employees are not automatically subject to having poor performance documented in their files, there is no evidence that Lizotte ever, in fact, made any such documentation regarding Lufkin. Furthermore, there is no suggestion that Lufkin was privy to any communication between McKenney and Lizotte or even became privy to such a communication prior to Lizotte's discovery deposition, so it is difficult to understand how such conduct could have served to dissuade him from exercising his rights under federal or state anti-discrimination law.

Next, Mr. Lufkin characterizes as retaliatory Ms. McKenney's conduct during the March 11, 2004, meeting.  He alleges that McKenney accused him of excessive absenteeism and warned him against using the ICU computer for personal use.  He contends that none of the female nurses were warned despite their use of the computer for personal matters.  (Pl.'s Opp'n Mem. at 19-20.)  One problem with this assertion is that the parties' statements of material facts do not contain any statements to the effect that McKenney accused Lufkin of excessive absenteeism at the March 11 meeting.  As for personal computer use, the record reflects only that Ms. Arno, acting as relief charge nurse, orally warned or "counseled" Lufkin on February 22, 2004, about excessive personal use of the computer while on duty.  It also indicates that when the matter was made known to Ms. McKenney, she merely warned him that if it continued she would discipline him.  (DSMF ¶ 109.)  There is no contention by Lufkin, let alone objective evidence, that excessive personal use of the ICU computer was not, in fact, inappropriate conduct.  Nor has Lufkin put forward any evidence of excessive computer use by any of the female nurses.  Finally, EMMC asserts, and supports with a citation to record evidence, that McKenney similarly counseled two female nurses.  (Id. ¶ 110.)  Although

34

Lufkin denies this statement of fact, he offers nothing in its place to support a finding that Ms. Arno, Ms. Lizotte or Ms. McKenney actually ignored or condoned excessive computer use by anyone. In fact, a text search of his statement of material fact does not turn up the word computer at all.

Finally, Lufkin points to the fact that Ms. McKenney said he should be documented as AWOL when he failed to come to work over the weekend of March 20-21, 2004. (Pl.' Opp'n Mem. at 20.) But the record reflects that this arose from a misunderstanding or miscommunication about the duration of Lufkin's leave. Although McKenney authorized two weeks of leave on account of Lufkin's family problems (DSMF ¶ 129) and suggested he apply for family medical leave when Lufkin said he was too upset to work due to a custody dispute (id. ¶ 113), Lufkin never informed her or the ICU Department that he had applied for more extended leave under the FMLA (id. ¶ 126) and he admits the statement that McKenney understood that he would be back to work on March 19 (id. ¶ 129). In addition, the matter was cleared up in short order by EMMC's Human Resources Department and any disciplinary entries on his file were removed on March 22. (Id. ¶¶ 130, 144-146.) In light of the fact that Lufkin admits McKenney misunderstood the situation and that EMMC rectified the situation promptly I conclude that no reasonable juror could regard this episode as something that would dissuade a reasonable person from making or supporting a claim of retaliation. Furthermore, even if a prima facie case of retaliation could be made out on this kind of record, Lufkin has admitted that the matter arose from a failure of communication and from a misunderstanding on McKenney's part. These are legitimate, non-discriminatory reasons for the phone calls and temporary write-up. Nothing in the record tends to expose these

reasons as pretexts for retaliation.  Because none of the arguments raised by Mr. Lufkin

in support of his retaliation claim find any support in the summary judgment record, I

conclude that summary judgment should enter against the retaliation claim as well.

### Conclusion

For the reasons stated above, I RECOMMEND that the Court GRANT the

defendant's motion for summary judgment with respect to all claims.

### NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum, and
request for oral argument before the district judge, if any is sought, within
ten (10) days of being served with a copy thereof.  A responsive
memorandum and any request for oral argument before the district judge
shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.


/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 7, 2006